2006 ND 212

**STATE of North Dakota, Plaintiff and Appellee,**

v.

**Todd Lance EBEL, Defendant and Appellant.**

Nos. 20050440—20050443.

Supreme Court of North Dakota.

Oct. 17, 2006.

Ronald W. McBeth, Assistant State's Attorney, Law Enforcement Center, Wahpeton, N.D., for plaintiff and appellee.

Steven M. Light (argued) and Lorelle A. Moeckel (appeared), Larivee & Light, Fargo, N.D., for defendant and appellant.

CROTHERS, Justice.

[¶ 1] Todd Ebel appeals from a criminal judgment and commitment entered upon his conditional guilty plea to one count of possession of a controlled substance and two counts of possession of drug paraphernalia. We conclude probable cause existed to support the issuance of the search warrant and the district court did not err in denying Ebel a hearing under *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

I

[¶ 2] On December 29, 2004, Police Officer Dustin Hill contacted a district court judge via telephone to obtain a search warrant for Ebel's residence in Hankinson. Officer Hill requested the warrant because he believed Ebel's residence was the site of a methamphetamine lab.

[¶ 3] Officer Hill testified via telephone, offering information supporting his application for a search warrant of Ebel's residence. Officer Hill provided information he had received from Richland County Deputy Sheriff Shane Orn, that Deputy Orn had received several complaints of come-and-go traffic, loud parties and strange activity at the residence. Officer Hill testified that he had observed two vehicles making short stops at the residence earlier that day and that Deputy Orn had seen come-and-go traffic, specifically three vehicles in a matter of ten minutes the same day. Officer Hill indicated others had observed come-and-go traffic over the last several months.

[¶ 4] Officer Hill offered statements from Joseph O'Meara, who is Hankinson's mayor and Ebel's neighbor. Officer Hill stated, "[O'Meara] said it's just non-stop. He said it's just cars are coming and going at all hours of the night. He specifically stated that people would leave the house at eleven o'clock at night ... or they would get there at eleven o'clock at night and be coming and going until four or five in the morning." Hill testified O'Meara stated he specifically observed that within the last two weeks, a female ran into the house, came out, held up her hand, "[h]ad a small package and then hopped in the car and took off." Based upon his training and experience, Officer Hill testified he believed O'Meara had witnessed a drug transaction.

[¶ 5] Hill also offered an account of a recent confrontation between O'Meara and Ebel that occurred at four o'clock in the morning, stating: "[Ebel] was in his underwear, standing outside in the cold, singing with his dog and [O'Meara] stated that [Ebel] could not look in his eyes. He was jittery. He had all the signs of what was described to him through his training of an individual being under the influence of methamphetamine." Hill testified that O'Meara, as a member of the fire department, had received training within the last year from officers on identifying possible methamphetamine labs, including what to look for and observe.

[¶ 6] Officer Hill also testified as to information provided by Ron Hubrig, the city water and sewer supervisor. Hill testified the city had experienced a problem with drains clogging in the city sewer system, and they worked with the mayor to figure it out, "slowly traced it back over a year's time to, within the last two weeks, ... that shop towels and rubber gloves have been coming into the pump station." Hill testified the city traced these items "directly back to a manhole cover" near Ebel's residence. Officer Hill testified, "[t]his is a closed sewer system ... [and] ... [t]he only other individual [other than

Ebel] who has access to that is across the street, the Mayor." Officer Hill asserted that the shop towels and rubber gloves, indicating the potential presence of a methamphetamine laboratory, could only have come from the mayor's house or Ebel's house.

[¶ 7] Officer Hill testified that O'Meara also stated that O'Meara's wife had observed Ebel bringing "cylindrical tanks into the residence," further indicating potential illicit manufacturing of methamphetamine. Specifically, Hill testified the tanks could be holding anhydrous ammonia, which is used in methamphetamine production. Hill also testified that the mayor and his wife had observed several doors and windows in the home open in cold weather, further indicating "to officers through their training and experience that they are airing the residence out. This happened several times ... this happens during the production of methamphetamine due to the release of noxious chemicals and gases, during the chemical process."

[¶ 8] Based upon the information provided to the district court in Officer Hill's telephone testimony, the court issued a warrant to search Ebel's residence. In issuing the warrant, the district court stated:

There is probable cause to search based on the open windows during the winter in combination with the tanks going into the house recently and the rubber gloves and the shop towels being found in the sewer that can be traced only to Mr. Ebel's residence. The other information also is corroborative of a possible methamphetamine lab and distribution. So based on that I will find probable cause.

In January 2005, law enforcement searched Ebel's residence and seized drug paraphernalia and controlled substances.

Ebel was arrested for possession of drug paraphernalia and subsequently charged with two counts of possession of drug paraphernalia and two counts of possession of a controlled substance.

[¶ 9] In March 2005, Ebel moved to suppress the evidence seized during the execution of the search warrant, claiming the warrant was issued without probable cause. On May 31, 2005, the district court denied his motion, explaining in its memorandum opinion and order:

The primary basis for ... finding that there was probable cause to believe that methamphetamine was being manufactured at Ebel's residence was that rubber gloves and shop towels found in the sewer system could be traced to Ebel and Ebel was witnessed carrying acetylene tanks into his home. Testimony indicated that these types of gloves and towels are commonly used in the manufacturing of methamphetamine. Officer Hill also testified that acetylene tanks may be used to hold anhydrous ammonia, an ingredient of methamphetamine. In addition to this "primary evidence," [the district court] also acknowledged that other corroborative evidence, such as the stop and go traffic in front of Ebel's home and the windows being open during the winter, indicated drug activity.

[¶ 10] After the district court's denial of his motion to suppress, Ebel raised the potential of a *Franks* issue at an October 2005 status conference and was thereafter permitted to file a motion seeking a *Franks* hearing and a request for reconsideration of his motion to suppress. Under *Franks*, 438 U.S. 154, 155–56, 98 S.Ct. 2674, 57 L.Ed.2d 667, the Fourth Amendment requires a hearing be held at the defendant's request, if a defendant makes a substantial preliminary showing that a false statement knowingly and intentional-

ly, or with reckless disregard for the truth, was included in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause. On October 26, 2005, the district court denied Ebel's motion to reconsider probable cause and denied Ebel's request for a *Franks* hearing. Ebel ultimately entered a conditional guilty plea to two counts of possession of drug paraphernalia and one count of possession of a controlled substance. The State dismissed with prejudice one charge for possession of a controlled substance. Ebel appeals from the judgment and commitment for three of those counts.

## II

[¶ 11] Ebel asserts the district court erred in denying his motion to suppress, arguing there was insufficient information to support probable cause for issuance of the search warrant.

[¶ 12] The Fourth Amendment of the United States Constitution, as applicable to the states by the Fourteenth Amendment, and N.D. Const. art. I, § 8, require searches and seizures to be reasonable and warrants to be issued only upon a showing of probable cause. Whether probable cause exists to issue a search warrant is a question of law. *State v. Stewart*, 2006 ND 39, ¶ 6, 710 N.W.2d 403; *State v. Hage*, 1997 ND 175, ¶ 10, 568 N.W.2d 741. "The standard of proof necessary to establish guilt at trial is not necessary to establish probable cause." *State v. Ballweg*, 2003 ND 153, ¶ 18, 670 N.W.2d 490. "We defer to a magistrate's determination of probable cause so long as a substantial basis for the conclusion exists, and we resolve doubtful or marginal cases in favor of the magistrate's determination." *Stewart*, at ¶ 6.

[¶ 13] This Court uses the totality-of-the-circumstances test in reviewing the sufficiency of information before the magistrate, independent of the court's decision. *State v. Nelson*, 2005 ND 59, ¶ 16, 693 N.W.2d 910; *State v. Rydberg*, 519 N.W.2d 306, 308 (N.D.1994). To establish probable cause, there must be a nexus between the place to be searched and the contraband sought. *Nelson*, at ¶ 17. Circumstantial evidence may be used to establish that nexus. *Id.* (citing *State v. Dodson*, 2003 ND 187, ¶¶ 11–12, 671 N.W.2d 825). "Probable cause exists when 'there is a fair probability contraband or evidence of a crime will be found in a particular place.'" *State v. Corum*, 2003 ND 89, ¶ 27, 663 N.W.2d 151 (quoting *State v. Guthmiller*, 2002 ND 116, ¶ 10, 646 N.W.2d 724).

[¶ 14] Mere suspicion criminal activity is taking place, which may warrant further investigation, does not rise to a level of probable cause to search. *See State v. Thieling*, 2000 ND 106, ¶ 8, 611 N.W.2d 861. "The relevant inquiry is not whether conduct is innocent or guilty, but what degree of suspicion attaches to it." *Ballweg*, at ¶ 18 (citing *Illinois v. Gates*, 462 U.S. 213, 245, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), and *Guthmiller*, 2002 ND 116, ¶ 13, 646 N.W.2d 724).

[¶ 15] Citizen informants are presumed to be a reliable source of information. *State v. Rangeloff*, 1998 ND 135, ¶ 22, 580 N.W.2d 593; *Hage*, 1997 ND 175, ¶ 16, 568 N.W.2d 741. If possible, this reliability should be evaluated and verified by independent investigation by police. *Rangeloff*, at ¶ 22. Additionally, where the information presented to the magistrate demonstrates conduct or activity of a "protracted and continuous" nature, the passage of time is less important to the validity of the probable cause. *Hage*, ¶ 12. Drug dealing is intrinsically a "protracted and continuous" activity. *Id.* at ¶ 13.

[¶ 16] In *Stewart*, 2006 ND 39, ¶ 10, 710 N.W.2d 403, this Court concluded statements from criminal informants coupled with the trained officer's deductions yielded probable cause for the issuance of a search warrant. Here, Officer Hill presented first-hand information relating to Ebel's activities from presumed reliable citizen informants, namely Ebel's neighbors—the mayor and the mayor's wife. Officer Hill's testimony to the magistrate in obtaining the warrant indicated come-and-go traffic over several months. Both Hill and another police officer had corroborated come-and-go traffic at Ebel's residence. "[T]he independently corroborated and detailed observations of frequent short term traffic entering and leaving the appellant's residence is the kind of 'abnormal activity' which raises suspicion of drug-related criminal conduct when viewed against the other circumstances alleged in the affidavit." *State v. Ronngren*, 361 N.W.2d 224, 229 (N.D.1985) (quoting *United States v. Sumpter*, 669 F.2d 1215, 1222 (8th Cir.1982)).

[¶ 17] Officer Hill offered the mayor's wife's observation of cylindrical tanks being taken into the house. Both the mayor and his wife observed doors and windows open during cold winter weather periods and were reported to have observed open windows in Ebel's residence just a few days prior to the application for the warrant in December. Officer Hill testified the presence of tanks and the open windows was indicative of methamphetamine production taking place on the premises. Officer Hill offered testimony regarding the mayor's observations of Ebel's strange behavior, which from the mayor's training was consistent with methamphetamine use.

[¶ 18] Officer Hill testified that rubber gloves and shop towels had been coming into the city's sewer system and that the city had traced these items directly back to a manhole cover near Ebel's residence. Officer Hill further testified that because it was a closed sewer system, the items could only have originated from Ebel's house or the mayor's house. Officer Hill indicated that in his experience all of these facts together were indicative of the presence of a methamphetamine manufacturing operation at Ebel's residence.

[¶ 19] Here, the magistrate was presented with a variety of evidence indicating drug activity was occurring at Ebel's residence. In light of all the evidence presented to the magistrate and considering the laminated total of information presented, we conclude there existed a fair probability a methamphetamine lab would be found in Ebel's house. Under the "totality of the circumstances" with deference to the district court, the magistrate had sufficient probable cause to issue a search warrant for Ebel's residence.

### III

[¶ 20] Ebel argues the district court erred in denying his request for a *Franks* hearing. When a defendant alleges false or misleading statements have been made in the application for a search warrant, we address the issue under the standard set forth in *Franks*, 438 U.S. at 155–56, 171–72, 98 S.Ct. 2674. Under *Franks*, the affidavit, or in this case the telephonic testimony, must contain truthful statements.

> [However,] [t]his does not mean "truthful" in the sense that every fact recited in the warrant affidavit is necessarily correct, for probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily. But surely it is to be "truthful" in the sense that the informa-

tion put forth is believed or appropriately accepted by the affiant as true. *Franks,* at 165, 98 S.Ct. 2674.

[¶ 21] A false statement under *Franks* is "one that misleads a neutral and detached magistrate into believing the stated facts exist, and those facts in turn affect the magistrate's evaluation of whether or not there is probable cause." *State v. Donovan,* 2004 ND 201, ¶ 7, 688 N.W.2d 646 (internal quotation omitted). *See also State v. Schmitt,* 2001 ND 57, ¶ 10, 623 N.W.2d 409; *State v. Ennis,* 334 N.W.2d 827, 831 (N.D.1983). That standard may also apply to statements that are deliberately false or misleading by omission. *See Rangeloff,* 1998 ND 135, ¶ 9, 580 N.W.2d 593; *State v. Winkler,* 552 N.W.2d 347, 352 n. 1 (N.D.1996). However, "for an omission to serve as the basis for a hearing under *Franks,* it must be such that its inclusion in the affidavit would defeat probable cause." *Rangeloff,* at ¶ 9 (internal citation omitted).

[¶ 22] In response to a request for a *Franks* hearing, a hearing is only required if:

(1) a defendant makes a substantial preliminary showing, accompanied by an offer of proof, that false statements were made in support of a search warrant, either knowingly and intentionally or with reckless disregard for the truth, and (2) the allegedly false statements are necessary to a finding of probable cause. No evidentiary hearing is required if there remains sufficient evidence to support a finding of probable cause without the allegedly false statements, and allegations that false statements were negligently or innocently made are insufficient to necessitate an evidentiary hearing.

*Rangeloff,* at ¶ 10 (quoting *State v. Handtmann,* 437 N.W.2d 830, 836 n. 3 (N.D. 1989).) The allegations of false statements must clearly delineate which statements are claimed to be false and should be accompanied by a statement supporting the reasons the statements are believed to be false. *Rangeloff,* at ¶ 10. "Affidavits or other reliable nonconclusory statements of witnesses should be furnished, or the absence of such support satisfactorily explained." *Id.* The defendant's burden of proof necessary to make a threshold showing is something less than a preponderance of evidence. *Id.*

[¶ 23] We have previously stated that the district court's ruling on whether a "substantial preliminary showing" has been made is a finding of fact, but we review the district court's finding of fact in a preliminary criminal proceeding under a separate, but comparable, standard. *Rangeloff,* 1998 ND 135, ¶ 10, 580 N.W.2d 593; *City of Fargo v. Thompson,* 520 N.W.2d 578, 581 (N.D.1994). We will not reverse a district court's findings of fact in preliminary proceedings of a criminal case "if, after the conflicts in the testimony are resolved in favor of affirmance, there is sufficient competent evidence fairly capable of supporting the [district] court's findings, and the decision is not contrary to the manifest weight of the evidence." *Rangeloff,* at ¶ 10 (quoting *City of Fargo,* 520 N.W.2d at 581).

[¶ 24] In requesting a *Franks* hearing, Ebel asserts Officer Hill misrepresented to the district court that the rubber gloves and shop towels found in the sewer system could be directly traced back to Ebel. In support of his request for a *Franks* hearing, Ebel submitted an affidavit from Hubrig, the city water and sewer supervisor, which countered Officer Hill's assertion to the district court about the origins of the rubber gloves and shop towels when obtaining the search warrant for Ebel's residence.

[¶ 25] Specifically, the city water and sewer supervisor's affidavit stated, in part:

7. There are seven households on that stretch of street so for me to determine which point of origin [the shop towels and rubber gloves] came from would be hard to speculate.

8. I could not pinpoint which exact house the debris had come from.

9. I did not tell law enforcement officers that the gloves, and rags I found in the net of the manhole would have only come from the Mayor's house or Todd Ebel's house;

10. It would be incorrect to categorize my statement regarding the rubber gloves and towels to say they could have only come from one of these two houses.

[¶ 26] Hubrig's affidavit counters Officer Hill's testimony in obtaining the search warrant from the district court. Instead of the shop towels and rubber gloves only originating from either Ebel's house or the mayor's house, Hubrig's affidavit identifies "seven households on that stretch of street." Even assuming Hubrig's affidavit initially demonstrates, at least for purposes of an initial showing, either intentional falsity or reckless disregard by the officer sufficient to make a "substantial preliminary showing," a hearing under *Franks* is not required if, setting aside the material that is the subject of alleged falsity or reckless disregard, there remains sufficient content in the warrant affidavit to support probable cause. *See United States v. Oleson,* 310 F.3d 1085, 1090 (8th Cir.2002) (even if warrant application is corrected as defendant suggested, probable cause still existed to support its issuance); *United States v. Jacobs,* 986 F.2d 1231, 1233–34 (8th Cir.1993) (hearing on warrant's validity required only where defendant can demonstrate warrant would not have established probable cause if corrected).

[¶ 27] Here, after correcting the potentially false information in Hill's testimony in support of issuance of the warrant, we conclude the remaining information is sufficient to establish a nexus to support probable cause. With regard to the rubber gloves and shop towels found in the sewer, even without the information that their origins pointed to only two houses, Ebel's residence remained one of seven residences as a potential source for these items. Hubrig's proffered affidavit neither rebuts the fact that the gloves and towels were found in the sewer, which as Officer Hill testified indicated the presence of methamphetamine production, nor does the affidavit eliminate Ebel's house as a potential source for these materials.

[¶ 28] Ebel argues Officer Hill also made a false statement by failing to inform the district court that Ebel is a welder by profession. Again, Ebel has not presented any evidence whether this omission by Officer Hill was either intentional or reckless. Ebel asserts his occupation as a welder provides an innocent explanation for possessing the cylindrical tanks observed being taken into Ebel's house. But our inquiry is not whether conduct is innocent or guilty; rather the degree of suspicion that attaches to it. *See Ballweg,* 2003 ND 153, ¶ 18, 670 N.W.2d 490. We conclude the fact Ebel was a welder does not alone preclude the existence of probable cause to support the issuance of the warrant. We therefore hold that Ebel did not make a substantial preliminary showing requiring an evidentiary hearing under *Franks.*

[¶ 29] We conclude the district court's denial of Ebel's request for a *Franks* hearing was proper. We therefore affirm the district court's denial of a *Franks* hearing and the court's determination that proba-

ble cause existed to support the issuance of the search warrant.

## IV

[¶ 30] The district court judgment is affirmed.

[¶ 31] GERALD W. VANDE WALLE, C.J., and DALE V. SANDSTROM, CAROL RONNING KAPSNER, and MARY MUEHLEN MARING, JJ., concur.